## SHEPARD et al. v. KINNER.

(Circuit Court of Appeals, Second Circuit.   March 2, 1898.)

### No. 47.

PATENTS—LICENSES—REVOCATION.

A patent owner executed a license, with a stipulation that the royalty provided for should not be payable so long as a certain contemporaneous agreement remained in force, and was observed by all the parties thereto, but that, if it became inoperative without fault on the licensor's part, then the licensee should pay royalties. The other agreement, to which the licensor and licensee were parties, was one whereby several makers of the article in question pooled their interests for the purpose of sustaining prices. After a time, one of the parties withdrew from this association; and later, through increased competition, and failure of some members to regard the agreement, prices were much reduced, meetings of the association ceased to be held, and reports of sales were no longer made to it by the members. Thereupon the licensor gave notice that he would not consent to sales at such prices, and should insist on payment of royalties. *Held*, that the agreement ceased to be operative, in the meaning of the stipulation in the license, when it was no longer effectual to maintain prices, and the licensor, not being in fault, was entitled to royalties from the time of such notice.

Appeal from the Circuit Court of the United States for the District of Connecticut.

John P. Bartlett and Chas. E. Mitchell, for appellants.
W. E. Simonds, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The assignments of error present the single question whether the court below erred in adjudging that the license granted by the firm of William B. Curtis & Co. to the defendants to manufacture and sell the wire hat frames of the patent in suit was not in force when the suit brought to restrain infringement of the patent was commenced.

By an instrument executed December 12, 1885, between William B. Curtis & Co., as parties of the first part, and the defendants, as parties of the second part, the defendants were licensed by William B. Curtis & Co. to make and sell the patented hat frames until the expiration of the patent. "subject to the payment of royalty." It contained also the provisions as follows:

"Said parties of the second part shall not be bound to pay any royalty under the license just stated, so long as the said other agreement of even date herewith, hereinbefore referred to, shall remain in force, and be observed by all the parties thereto. But after said other agreement shall cease to be operative, and in the case said other agreement does not become nonoperative through the violation thereof by said parties of the first part, then said parties of the second part shall pay royalty to said parties of the first part upon all drooping wire frames for hat brims of round wire made and sold by said party of the second part at the rate of ten per cent. upon the proceeds of all sales of such wire frames for hat brims made and sold by said parties of the second part,—sworn monthly accounts of such sales to be rendered to said parties of the first part as of and for the last secular day of each month, and the payment of royalty thereof to be made within fifteen days thereafter; and, in case the said parties of the second part shall not render accounts and pay royalties as herein provided for, then said license shall be revocable at the option of said parties of the first part."

The "other agreement" mentioned in the license was of the same date, and was made between William B. Curtis & Co., as party of the first part; George B. Sherman, as party of the second part; the defendants, as parties of the third part; and Charles S. Andrews, as party of the fourth part. The parties to this agreement had been competitors in the manufacture and sale of hat frames. Sherman was a licensee of William B. Curtis & Co., and the defendants and Andrews had been making and selling the patented article, and a suit for infringement of the patent had been prosecuted by William B. Curtis & Co. against the defendants. The object of the agreement was to adjust the difference between the parties, and combine their interests, and in that behalf to establish a uniform selling price for the articles, and pool and apportion the profits of all sales. The cost of manufacture was estimated to be $10\frac{1}{2}$ cents per dozen, and the agreement contemplated fixing a minimum selling price which would yield a profit of 13 cents per dozen. The agreement provided for monthly meetings of the parties, at which statements under oath of all sales during the preceding month were to be delivered by each. It provided that each of the parties at such meetings should pay into a common fund 13 cents for each dozen of the article sold, and that the fund should be divided between them in specified proportions. Further provisions were as follows:

"This agreement shall be perpetually binding upon all said parties hereto, and, if one of the parties hereto shall in two instances substantially violate this

agreement, then each of the other parties to this agreement is, at the option of said party last mentioned, released herefrom. No one of said parties hereto shall sell hat wires at less than twenty-five cents per dozen, minus a discount of six per cent., excepting existing contracts already made by party of the fourth part; but this selling price may be changed by the agreement of three of said parties hereto, and any such change shall be binding upon all parties hereto, without otherwise affecting this agreement. In any matters mentioned in this agreement as determinable or changeable by action of the parties hereto, each of said four parties shall have one voice or vote, and no more, in making any such determination or change."

For a time the terms of this agreement were adhered to by all parties. In November, 1890, Andrews withdrew from the combination. Owing to competition and other causes, the minimum selling price of the patented article was from time to time reduced, all parties consenting. Eventually, the profits payable into the common fund became comparatively insignificant, informal conferences were substituted for regular meetings, and after the spring of 1893 no accounts were rendered, and no conferences were held. According to the evidence for the complainant, after the minimum selling price had been established at 12 cents, and 6 per cent. discount, per dozen, he refused to consent to any further reduction. According to the evidence for the defendants, for a considerable period before the parties ceased rendering accounts there had been no established selling price, and the cost price was estimated at 10 cents per dozen, and each party sold at the best price he could get, reporting only sales at prices above cost price; and after the spring of 1893 no sales were reported, and nothing was divided, because the selling price did not exceed the cost price.

In September, 1892, the complainant became sole owner of the patent. Early in September, 1893, he demanded a statement of account from the defendants; and one was rendered by them, showing sales from May 1 to September 1, 1893, at prices ranging from 6 to 10 cents per dozen. The complainant thereupon notified the defendants, in substance, that he would not consent to sales at such prices, and that he should stop them if he could. December 26, 1893, he served defendants with notice of revocation of the license. The present suit was commenced in February, 1894.

Upon the evidence in the record, it seems entirely clear that after the spring of 1893 the so-called pooling agreement had become merely a rope of sand. There was no concerted action under it. The defendants and Sherman insisted that, as modified, it meant one thing, and the complainant that it meant another; and each of the parties was acting according to his own construction. The defendants and Sherman claimed the right to sell the patented article below cost of manufacture, if they chose, and were constantly doing so. They were contributing nothing to the common fund, and were pursuing a course which would necessarily prevent the complainant from maintaining prices, but were yet insisting that, if he made any sales at a profit, he should be accountable to them for their pooling proportion.

The license contemplated that the William B. Curtis Company should receive an equivalent for the privilege granted to the defendants under the patent. It provided that they should pay roy-

alty at the rate of 10 per cent. upon the proceeds of their sales of the patented article, whenever, without fault of the licensors, the original pooling agreement should cease to be operative. That agreement did cease to be operative when it was no longer effectual to maintain the selling price for the patented article as between the parties to it.

After Andrews withdrew from the combination, the concurrence of all the remaining parties was necessary to authorize a reduction or change in the minimum selling price. That the complainant ever consented to a reduction by which the minimum selling price was to be less than the cost of the article is highly improbable, and we do not for a moment believe it to be true; but if he did, and each party except the complainant was at liberty to sell for any price he pleased, and was selling at prices less than cost, and paying nothing into the common fund, there was nothing of substance left of the original agreement. Under such circumstances it was only operative to deprive the complainant of any royalty or rights as the owner of the patent. Undoubtedly, the complainant is estopped from asserting that the pooling agreement was not operative during the period when he saw fit to treat the situation as one which was consistent with the meaning and purpose of the agreement. But the estoppel extends no further. We are satisfied that he did not violate the agreement himself, and that he had ample justification for refusing to regard it as longer in force. The defendants were informed of his position in September, 1893. If, after this, they had rendered monthly accounts, and offered to pay the royalty reserved by the license, they would have had a defense to the present suit. As it is, there was no defense, and the decree of the circuit court was right.

The decree of the circuit court is affirmed, with costs.