In the Matter of the Complaint of POTO-MAC TRANSPORT, INC., as Owner of S/S POTOMAC, for Exoneration from or Limitation of Liability, Plaintiff–Appellant, Cross–Appellee.

Bangladesh Shipping Corporation, Plaintiff–Appellee, Cross–Appellant,

v.

OGDEN MARINE, INC., Defendant–Appellant, Cross–Appellee.

Royal Insurance Company of America, et al. ("Cargo Claimants"), Claimants–Appellees, Cross–Appellees.

Nos. 1266, 1416, Dockets 90–7067, 90–7089.

United States Court of Appeals, Second Circuit.

Argued May 16, 1990.

Decided July 13, 1990.

Joseph C. Smith, Burlingham Underwood & Lord, New York City, for plaintiff-appellant Potomac Transport and defendant-appellant Ogden Marine.

Christopher H. Mansuy, Walker & Corsa, New York City, for appellee-cross-appellant Bangladesh Shipping.

Richard W. Stone, II, Waesche, Sheinbaum & O'Regan, P.C., New York City, for appellees Cargo Claimants.

Before OAKES, Chief Judge, and PIERCE and PRATT, Circuit Judges.

OAKES, Chief Judge:

This appeal and cross-appeal arise out of the collision between the S/S POTOMAC ("POTOMAC") and the M/V BANGLAR BAANI ("BAANI") shortly after 1:00 a.m. on February 8, 1982, in the Gulf of Mexico west of the Florida Keys. Although not before us on appeal, the question that truly puzzles

us is how two fully-equipped vessels several miles apart on a clear night somehow could manage to maneuver themselves into one another's side quarters.

BAANI, a Bangladesh flag general cargo vessel owned by the Bangladesh Shipping Corp. ("BSC"), was travelling in a southeasterly direction and was loaded with cargo. POTOMAC, a United States flagship owned by Potomac Transport Inc. ("Potomac Transport") and managed and operated by Ogden Marine Inc. ("OMI"), was travelling southwesterly. BAANI, although fully equipped, was proceeding without having either its radar equipment or radios turned on. BAANI's second mate, Olav Dacunha, was navigating BAANI, and a lookout was on watch. POTOMAC's navigation at the time of the collision was under the direction of her third mate, John Kampmann, who was on his first voyage after having received his license; Kampmann had a helmsman and a lookout, and had switched on POTOMAC's radar and two VHF radios.

Shortly after 1:00 a.m. on the fateful night, Kampmann observed on POTOMAC's radar that BAANI was approaching on POTOMAC's starboard bow and that a close crossing situation would occur if the vessels did not alter course. Following Rules 15 through 17 of the International Regulations for Preventing Collisions at Sea ("Rules of the Road"), 33 U.S.C. foll. § 1602 (1982 & Supp. V 1987), Kampmann recognized that POTOMAC was the give-way vessel that was required to alter course to starboard and pass astern of BAANI, while BAANI was the stand-on vessel that was required to hold her course and speed. Accordingly, Kampmann altered POTOMAC's angle of navigation from 235 degrees from the north-south vertical line to 265 degrees. However, he had not been able to complete his rapid radar plot to determine the new angle of navigation necessary to avoid BAANI and to pass her astern; instead, he preliminarily concluded that a starboard shift of at least 30 degrees was required, with further starboard shifts perhaps becoming necessary.

After steadying on the new 265–degree course, Kampmann observed that BAANI, as required, was maintaining a steady course, but that POTOMAC's new course would result in a collision or near collision with BAANI. Accordingly, he made a further starboard shift of 10 degrees. Meanwhile, BAANI's mate, Dacunha, following two visual sightings of POTOMAC that were approximately three minutes apart, did not detect POTOMAC's course shift and thus assumed, according to his testimony at trial, that POTOMAC was maintaining a steady course, contrary to her required role as the giveway vessel under Rule 16 of the Rules of the Road. Dacunha therefore began altering BAANI's course to port, seeking to avoid POTOMAC by passing her astern. By this time, therefore, both vessels, seeking to pass astern of one another, were in fact steadily shifting course in such a way that they were approaching each other.

Following BAANI's shift to port, Kampmann ordered POTOMAC to come 20 degrees further starboard, to 295 degrees, and as BAANI continued to swing to her port, Kampmann ordered POTOMAC to come hard right and fully astern, and sounded a danger signal. After POTOMAC had swung to 315 degrees, her bow struck BAANI's starboard quarter.

Potomac Transport, POTOMAC's registered owner, filed the initial complaint in this action, seeking exoneration from or limitation of liability for any loss or damage arising out of the collision, pursuant to the Limitation of Vessel Owner's Liability Act, 46 U.S.C.App. §§ 181–96 (Supp. V 1987). BSC, as owner and operator of BAANI, filed an answer to Potomac Transport's complaint seeking limitation of liability for the accident, and additionally filed a claim for damages against Potomac Transport. Potomac Transport in turn filed a counterclaim seeking relief from BSC for damage to POTOMAC. Royal Insurance Company of America and other parties having an interest in the cargo aboard the BAANI at the time of the collision ("cargo claimants") filed an answer to Potomac Transport's complaint and a claim against Potomac Transport for damages suffered by cargo claimants for cargo aboard the BAANI, and

several months later filed a cross-claim against BSC for damage to the cargo. Nearly one year after the initial complaint by Potomac Transport had been filed, BSC commenced an action against OMI, as manager and operator of POTOMAC, seeking to recover the same damages sought in BSC's claim against Potomac Transport in the limitation proceeding. In its answer, OMI alleged that it was entitled to protection under the Limitation of Vessel Owner's Liability Act, *supra.*

In very lucid Findings of Fact and Conclusions of Law filed November 29, 1989, the United States District Court for the Southern District of New York, John F. Keenan, Judge, ascribed fault for the collision at 75% to BAANI and 25% to POTOMAC and denied Potomac Transport's and OMI's petitions for limitation of liability. Having determined that BAANI's unseaworthiness (rather than simply a navigational error not attributable to BAANI's owners) contributed to cargo claimants' loss, the district court ruled that cargo claimants could recover the damages sustained by them from BSC as well as from Potomac Transport and OMI. The district court further ordered a trial to determine the damages recoverable. On December 18, 1989, the district court denied Potomac Transport's motion pursuant to Federal Rule of Civil Procedure 52(b) to amend the findings of fact and law, and declined, except to a very limited extent, BSC's similar motion to amend the findings and to direct entry of a new judgment.

Potomac Transport and OMI appeal the 25% share of liability allocated to POTOMAC and the district court's denial of their claims for limitation of liability. BSC cross-appeals its 75% share of liability and the district court's finding that it was liable to cargo claimants because the collision resulted from BAANI's unseaworthiness, and not simply from navigational negligence on the part of BAANI's crew. We principally affirm, and vacate in part.

## DISCUSSION

### 1. *Apportionment of Liability/Fault*

■ We conclude that the district court's findings of fact and apportionment of fault

for the collision were correct and certainly not clearly erroneous. *See Getty Oil Co. (Eastern Operations) v. SS Ponce De Leon,* 555 F.2d 328, 333–34 (2d Cir.1977) (district court's allocation of fault is a question of fact subject to the clearly erroneous test on appeal). Indeed, more than ample evidence indicates that the district court's allocation of fault was in all likelihood right on target.

As the district court found, the primary responsibility for the collision rests upon the crew of BAANI. BAANI's second mate on watch at the time of the collision, Olav Dacunha, was grossly negligent in assuming, on the basis of two cursory visual observations, that POTOMAC was maintaining course, contrary to her obligation as the give-way vessel under the Rules of the Road. Dacunha should have contacted POTOMAC by radio to confirm POTOMAC's position before violating BAANI's obligation as the stand-on vessel to maintain her course and speed. Lacking any reliable information (such as radar plotting or radio contact), Dacunha's actions in changing course and not observing the Rules of the Road governing crossings were beyond all reason.

Moreover, even if it had been necessary for BAANI to shift her own course to avoid POTOMAC, Dacunha was entirely negligent in shifting to port rather than to starboard. Rule 17(c) of the Rules of the Road provides that "[a] power-driven vessel which takes action in a crossing situation ... [in violation of its ordinary duty as a stand-on vessel to maintain course] to avoid collision with another power-driven vessel shall, if the circumstances of the case admit, not alter course to port for a vessel on her own port side." 33 U.S.C. foll. § 1602. By shifting to port, Dacunha increased the relative speed of approach of the two vessels and made avoiding action less likely to succeed.

The district court furthermore properly found that POTOMAC's officers were not faultless with regard to the collision. Not only did Kampmann, POTOMAC's third mate, fail either to complete the rapid radar plot to determine the correct course shift or to

slow down in order to allow completion of the rapid radar plot, but he also chose to shift the POTOMAC to a collision or near collision course. Kampmann admitted in his testimony that he should have altered his course 88 degrees, rather than simply 30 degrees, to achieve his objective of passing astern of BAANI. Instead, Kampmann embarked upon a course change which would have required incremental shifts in the angle of navigation, contrary to Rule 8(b) of the Rules of the Road, which cautions against a succession of course changes and states that a course change should "be large enough to be readily apparent to another vessel observing visually or by radar." 33 U.S.C. foll. § 1602. By hastily selecting a course change which actually made collision with BANNI more imminent, and by failing to make a sufficiently dramatic and detectable shift in course, POTOMAC's officers were not free from fault for the collision.

Moreover, the district court found that POTOMAC was, during the voyage at issue, in violation of the statutorily-mandated three-watch system, which requires that three mates stand in three watches. See 46 U.S.C. §§ 8104(d), 8301(a)(2) (Supp. V 1987). Having embarked upon its journey without a second mate, POTOMAC was being navigated with the two third mates splitting the second mate's watch. Although violation of this statutory rule was not proven to be a motivating cause of the accident, Potomac Transport did not meet its heavy burden under *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873), of absolutely proving that violation of the statute could not in any way have contributed to the accident. Accordingly, the district court properly allocated to POTOMAC some fault for the collision.

### 2. *Potomac Transport's and OMI's Limitation of Liability Claims*

■ The district court moreover properly rejected Potomac Transport's and OMI's claims for limitation of liability for the accident pursuant to the Limitation of Vessel Owner's Liability Act, 46 U.S.C. App. §§ 181–96. Under this statute, a shipowner may be exempt from liability for a collision if it had no knowledge or privity of the acts of negligence or unseaworthiness that caused the accident. *See In re Ocean Foods Boat Co.,* 692 F.Supp. 1253, 1258 (D.Or.1988). Privity and knowledge under the statute "have been construed to mean that a shipowner knew or should have known that a certain condition existed." *Hellenic Lines, Ltd. v. Prudential Lines, Inc.,* 730 F.2d 159, 166 (4th Cir. 1984).

Here, POTOMAC's master, Captain Hansen, failed to observe or stand watch with third mate Kampmann, despite this having been Kampmann's first voyage as a licensed third mate. The failure of a ship's master to exercise diligence in selecting, training, or supervising crew members whose navigational faults contribute to an accident is proper ground to deny limitation of liability. *See, e.g., Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1157–58 (2d Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979); *cf. In re Hercules Carriers, Inc.,* 566 F.Supp. 962, 977 (M.D.Fla.1983) (stating that in the case of a corporate shipowner, privity and knowledge may include privity and knowledge by a managing agent, officer, or supervising employee of a ship), *aff'd,* 768 F.2d 1558 (11th Cir.1985).

Moreover, both Potomac Transport and OMI failed to ensure that the vessel was being operated in a manner consistent with statutory rules and reasonable judgment. Because of their failure to ensure POTOMAC's compliance with the three-watch division, Potomac Transport and OMI are not entitled to limitation of liability for the collision.

### 3. *BSC's Limitation of Liability to Cargo Claimants*

Nevertheless, we vacate the district court's holding that BSC may be liable to cargo claimants. The district court had based its holding on the ground that loss to the cargo was caused by the unseaworthiness of BAANI, rather than simply by the navigational errors of BAANI's officers.

■ Section 4(2)(a) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. App. § 1304(2) (Supp. V 1987), provides that "[n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from (a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in navigation or in the management of the ship." The shipowner (here, BSC) has the burden of demonstrating that it is exempt from liability to cargo claimants because an "error of navigation," rather than unseaworthiness of the vessel, was the cause of the damage to the cargo. *See Director Gen'l of the India Supply Mission v. S.S. Maru*, 459 F.2d 1370, 1372 (2d Cir.1972), *cert. denied*, 409 U.S. 1115, 93 S.Ct. 898, 34 L.Ed.2d 699 (1973).

The district court found that BSC could not be exempt from liability to cargo claimants on the ground that a mere error in navigation caused the collision; rather, it deemed BAANI unseaworthy on the basis of its incompetent crew, as evidenced by the crew's improper response to an emergency. However, in the case cited by the district court to support its finding that incompetence of the crew in an emergency can justify a finding of unseaworthiness, *Cerro Sales Corp. v. Atlantic Marine Enter.*, 403 F.Supp. 562 (S.D.N.Y.1975), the crew was improperly trained, and not merely operationally negligent. *See id.* at 567. BSC on cross-appeal accordingly argues that no case has held that a single, isolated incident of mere navigational negligence is sufficient to constitute crew incompetence for which the carrier or shipowner may be held liable, and cites numerous cases declining to hold the master liable for the first instance of negligence on the part of the servant.

■ Contrary to BSC's argument, however, a finding of navigational negligence on a single occasion does not preclude an additional finding of unseaworthiness due to the crew's incompetence. In fact, "[w]hile a single series of events indicating gross negligence or mismanagement of the vessel may not be conclusive criteria determining the competency of the crew, certain instances can be revealing with regard to this issue." *In re Ta Chi Naviga-tion (Panama) Corp., S.A.*, 513 F.Supp. 148, 159 (E.D.La.1981), *aff'd*, 728 F.2d 699 (5th Cir.1984); *accord McGill v. Michigan Steamship Co.*, 144 F. 788, 795–96 (9th Cir.) (errors in navigation may be so extreme as to raise a presumption of the crew's incompetence), *cert. denied*, 203 U.S. 593, 27 S.Ct. 782, 51 L.Ed. 332 (1906); *The Cygnet*, 126 F. 742, 746 (1st Cir.1903) (single act of gross fault raised presumption of unseaworthiness of the vessel arising from negligence on the part of tug operator in selecting ship master). However, in such cases where navigational negligence is so extreme as to raise a presumption of incompetence of the crew, the shipowner or carrier may rebut the presumption by demonstrating that it exercised due diligence in selecting or training a competent crew. *See The Cygnet*, 126 F. at 746; *In re Ta Chi*, 513 F.Supp. at 159–60.

■ We conclude that the district court properly found that a presumption of incompetence by the crew of BAANI had been raised by the gross acts of negligence on the part of BAANI's mate on watch at the time of the collision. However, although the district court concluded that BSC failed to exercise due diligence in training BAANI's crew, it did not consider whether BSC had exercised due diligence in selecting a competent crew. Accordingly, we vacate the district court's holding on this issue and remand for further findings of fact concerning the inquiry made by BSC into the BAANI's crew's competence, training, and reputation. We also think it anomalous that the district court did not address BSC's possible limitation of liability under the Limitation of Vessel Owner's Liability Act, *supra*, to parties other than the cargo claimants (to Potomac Transport, for example). We therefore request the district court on remand to consider whether BSC may seek limitation of liability under this statutory provision, or else to specify why it declines to address the issue.

Judgment affirmed in part and vacated in part. Cause remanded.