## THE CYGNET.

### ÆTNA INS. CO. v. CONVERSE ·et al.

(Circuit Court of Appeals, First Circuit. February 4, 1903.)

No. 456.

1. TUG AND TOW—COLLISION OF TOW WITH BRIDGE—NEGLIGENT NAVIGATION OF TUG.

A tug with a barge in tow on lines 100 feet long, passing down the Merrimac river at night on an ebb tide, with the weather dark and rainy and a fresh wind blowing, *held* in fault for a collision between the barge and a bridge pier, where, although the passage was narrow and required the exercise of care and precaution, she proceeded at full speed and kept a course not in line with the passage until within 150 feet of the bridge, when the master changed her course and entered the passage before the tow was straightened out on her course and without looking to ascertain her position, the result being that the barge, though using her best efforts, was not able to avoid the pier.

2. SHIPPING—LOSS OF CARGO—EXEMPTION OF VESSEL FROM LIABILITY BY HARTER ACT.

The provision of section 3 of the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) that, if the owner of a vessel shall exercise due diligence to make the said vessel in all respects seaworthy, and properly manned and equipped and supplied, neither the vessel nor her owners shall be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, cannot be invoked to relieve a vessel from liability for loss of cargo resulting from the gross fault or negligence of the master, sufficient to raise a presumption of his incompetency, merely upon a showing that the owners had no knowledge or reason to believe that he was incompetent, that being insufficient to establish the "due diligence" required by the statute, the burden of proving which, under such state of facts, rests on the vessel. Quære, whether the statute applies in behalf of a tug which is towing a barge transporting cargo where both tow and tug are in the same ownership.

Appeal from the District Court of the United States for the District of Massachusetts.

Eugene P. Carver (Edward E. Blodgett, on the brief), for appellant: Arthur H. Russell, for appellees.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. In this case, disaster came to the barge Zulu and her cargo by reason of her being in collision with the upper point of one of the piers of the Rocks Bridge in the Merrimac river, while she was in tow of the steam tug Cygnet bound down the river for Newburyport, and by reason of such collision the barge was capsized and her cargo lost. The only question is one of fact, and is whether the disaster was caused by the fault of the tug or by that of the barge.

The passage between the piers of the bridge is a narrow one, and the currents incident to the ebb and flow of the tide at that point,

¶ 2. Statutory exemption of shipowners from liability for loss, see note to Nord-Deutscher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11.

taken in connection with the tortuous course of the channel and the narrow passage, create a situation which requires the exercise of care and precaution in making the voyage at this point, and we think the care and precaution of the tug were not what they should have been under the circumstances. According to the testimony of the master of the tug, who was called by her owners, the night was dark and rainy, and the wind quite fresh from the eastward; and, taking everything into account, we think the situation called for greater precaution and a higher degree of skill and diligence on the part of the tug than were exercised on the occasion in question. The barge was being towed by two hawsers attached to the towing bitts on the bow of the barge. These hawsers were about 100 feet in length. At the time of the accident the tug having the barge in tow was proceeding down the river on an ebb tide, and, after passing the red buoy above the bridge, the course of the tug was such as not to be in line with the opening between the piers of the bridge, and it was necessary, therefore, to make a turn or change in the course in order to make the passage. We think that reasonable care and prudence, under the circumstances, required the tug to change her course at such a time and at such a point as would enable her to straighten out the line before entering the opening between the piers. This was not done. The change in her course was not undertaken until the tug was within 150 feet of the bridge, and the consequence was that she had not so far completed the turn, coming in on a swing from the West Newbury side of the river, as to straighten out the tow at the time the tug passed the point of the pier with which the barge was brought into collision. At the time of the disaster the tug was proceeding at full speed, and at the rate of 3½ or 4 miles an hour through the water. Proceeding at this rate, with the pier on the inside of the circle, and entering the passageway before the line was straightened, the inevitable result was to bring the barge closer to the point of the pier than the tug herself was at the time she passed that point, and as a consequence the barge was brought into actual collision with the head of the pier around which the tug was making the turn.

We do not think it necessary to deal with the question of the competency of the master of the barge, for the fact appears that those on the barge did all they could to avert the collision by at once putting her wheel hard astarboard, thereby using all the power within their control to avoid the disaster. The movements of the barge were practically controlled by the tug. The tug determined the manner of making fast to the barge, and the time and manner at which the passage should be attempted. It appears that the captain of the tug neither looked to see whether the tow was straightened out on its course, nor received any information from the lookout in that respect after passing the red buoy. We think it was not reasonable for the tug, with such a length of tow, to delay the change of course until she was within 150 feet of the bridge. If, under the circumstances of the current, tide, weather, and darkness, the tug could not have changed her course seasonably, it was her duty, as master of the situation—especially as she is presumed to have

determined the time of sailing—to have lain by until the conditions secured safety. As a result, we think the collision was due to the fault of the tug, and not that of the barge.

The District Court, in its decree, gave the owners of the tug the benefit of the limitation liability provided by sections 4283–4285, Rev. St. U. S. [U. S. Comp. St. 1901, pp. 2943, 2944]. There seems to be no question that this portion of the decree was justified. In fact, the petition in behalf of the appellant admits this. Consequently, while there must be in the District Court a new decree adjudging the tug in fault, and giving the Ætna Insurance Company the benefit of its petition so far as consistent with the limitation of liability, that portion of the decree appealed from which concerns that limitation must be conserved in the new decree to be entered in accordance with our conclusions. Questions of interest, expenses attending the appraisal, and the taxable costs in the District Court, must be disposed of as directed in our opinion and judgment of September 16, 1896, in The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to enter a decree in accordance with our opinion passed down this day, and the Ætna Insurance Company will recover its costs of appeal.

## On Rehearing.

(October 23, 1903.)

PUTNAM, Circuit Judge. The steam tug Cygnet was engaged in towing a barge laden with cargo from Haverhill down the Merrimac river, in the course of which service the barge came in collision with the pier of a bridge, and, with her cargo, was lost. Thereupon the registered owners of the tug filed a petition, in the District Court for the District of Massachusetts, praying for limitation of liability, alike under sections 4283–4285, Rev. St. U. S. [U. S. Comp. St. 1901, pp. 2943, 2944], and under the so-called "Harter Act," namely, the act entitled "An act relative to navigation of vessels," etc., approved Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946], relying on the third section, as follows:

"Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers shall become or be held responsible. for damage or loss resulting from faults or errors in navigation, or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent or master, be held liable for losses arising from dangers of the sea or other navigable waters, acts of God or public enemies, or the inherent defect, quality or vice of the thing carried, or from insufficiency of package or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

In accordance with the settled practice under statutes limiting the liability of owners of vessels, the petition denied any fault on the part of the tug, but claimed limitation in the event the court found contrary to the contention of the petitioners in that particular; so

that there was no inconsistency in first denying that there was any liability whatever in any view of the facts or law, and afterwards, in case fault was found to exist, in claiming statutory relief.

The District Court found that the barge was in fault and that the tug was not, and thus relieved the owners of the latter. The owners of the cargo appealed, and this court, in an opinion passed down on February 4, 1903 (126 Fed. 742), rested the blame on the tug, and held that she was liable, subject to the benefit of the limitation given by sections 4283–4285, Rev. St. U. S. [U. S. Comp. St. 1901, pp. 2943, 2944]. The record owner of the tug thereupon applied for a rehearing, which we granted, limiting it, however, to the question of the application of the Harter act. Except as stated herein, the facts sufficiently appear in our opinion of February 4, 1903, subject to the qualification that, in accordance with allowable practice, the parties have amended the record by stipulating the facts necessary to establish that the owner of the barge was also the charterer of the tug, equipped and manned her and appointed her officers, and in all particulars became her owner pro hac vice. Therefore the case now presents itself as though, for some purposes, the absolute ownership of both barge and tug was the same during the voyage in question; and the petitioners, that is, the record owners of the tug, maintain that she is within the protection of section 3 of the Harter act, to the same effect as she would have been if the cargo had been laden aboard her instead of aboard the barge.

Neither in the Supreme Court nor in this court has the question of law thus presented been adjudicated. It is true that many expressions of the statute limit it to the relations between a vessel and her cargo, and this court, as well as the Supreme Court, has held generally that such is its scope. Yet, whether or not this limitation goes so far as to apply the statute exclusively to cargo actually laden aboard the specific vessel in fault, or whether it reaches a case like that at bar, where there is a common enterprise, the tug and tow belonging to the same owner, who is the carrier, and the cargo laden aboard the tow by the carrier, has not yet been authoritatively determined. We do not, however, find it necessary for the present case to determine this question, because the petitioners have not brought the tug in other particulars within the terms of the section of the Harter act on which they rely.

In order to obtain the benefit of that section, the owner of a vessel should have exercised "due diligence to make her" "in all respects seaworthy and properly manned." Of course, the words "properly manned" are used ex majore cautela, because, according to all the rules, if not properly manned when a vessel sails, she would not be seaworthy for ordinary purposes and under ordinary circumstances. But this case we may rest on the words "due diligence" and "properly manned." On the ordinary construction of exemptions in the interest of common carriers, and especially of the owners of seagoing vessels, the statute properly imposes on them, if they desire to receive the benefit of it, the burden of proving that they have exercised due diligence in the particulars referred to. But we do not even find it necessary to determine where the statutory burden rests. The

immediate question here has regard to the competency of the master of the tug, through whose personal fault, as we found in our previous opinion, the loss occurred. All that appears in the record in reference to him is that he was an engineer, had sailed on the Cygnet for two seasons as such, had been the captain of another small steamer, had acted as a pilot up and down the Merrimac river, had a license as a pilot on that river which permitted him to act as master of a tug of the tonnage of the Cygnet, and had been her master a short time before the barge was lost. There is no evidence in the record that the owners of the tug, either the record owners or the owner pro hac vice, had made any particular inquiries as to his competency. The petitioners seem to think it is sufficient to maintain their case that the owner or owners had no knowledge or reason to believe that the master was not competent; but this form of statement is not sufficient, because it does not comply with the statute, which requires "due diligence."

In our prior opinion, in determining that the loss occurred through the fault of the master of the tug, we said as follows:

"It appears that the captain of the tug neither looked to see whether the tow was straightened out on its course, nor received any information from the lookout in that respect after passing the red buoy."

This red buoy, we will note, was at the critical point in the navigation of the river. An omission so gross as this raises so strong a presumption of fact that the master was not competent as practically to throw the burden on the petitioners to establish the proposition that they used due diligence with reference to his selection, whether the statute does or not impose such a burden. Yet the other facts which appear in the record, so far from meeting this presumption, strengthen it. We are therefore not satisfied that whoever controlled the tug used the due diligence which the statute required in the selection of this master, necessary to justify us in relieving her from the liability for this loss which the common law imposed as the result of gross negligence at the critical time.

Inasmuch as granting the petition for a rehearing vacated the original judgment, we enter a new one in the same terms as follows:

The decree of the District Court is reversed, the case is remanded to that court, with directions to enter a decree in accordance with our opinions, the Ætna Insurance Company will recover its costs of appeal, and the mandate will issue forthwith.