## THE BUCKLEIGH.

Circuit Court of Appeals, Second Circuit.
March 11, 1929.

No. 82.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter and John J. Heckman, both of New York City, of counsel), for appellant.

Finkler & McEntire, of New York City (Frank I. Finkler, of New York City, and Jesse H. Finkler, of Brooklyn, N. Y., of counsel), for libelants-appellees.

Burlingham, Veeder, Masten & Fearey, of New York City (John L. Galey, of New York City, of counsel), for respondent impleaded appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. The merchandise in question was Spanish onions, a notoriously perishable cargo. But the shipment in this case was subject to somewhat more than the ordinary infirmities, because the onions had been harvested during the preceding summer, and were not shipped from Spain until February 23, 1923. Onions, as old as those were, generally showed more than the ordinary percentage of decay. The vessel arrived off the port of New York on March 16, 1923, and stranded at Jones Inlet that afternoon, while attempting to find Ambrose Channel, in a dense fog. The Merritt, Chapman & Scott Wrecking Company were summoned to salvage the vessel, but there was a long delay in unloading the onions, because of difficulties arising from the stranding. A considerable percentage of the onions became unmarketable, in part because of their age and condition on shipment, and in part because of the unusual delay caused by the stranding.

It is contended by the libelant that the vessel neglected properly to stow and care for the cargo, and that in any event her owners had not exercised due diligence to make the vessel seaworthy and properly manned, equipped, and supplied.

As for the stowage, there was not only the recital in the bills of lading that the shippers were satisfied with the stowage, and the uncontradicted testimony of the master of the Buckleigh that they insisted on having the onions carried in No. 1 'tween-deck, the coolest place on the vessel, but there was also ample testimony that the onions in that part of the ship were properly ventilated and carefully stowed.

The compartment was equipped with four 16-inch ventilators, so constructed that they could be trimmed to the wind. The master and chief mate went all over the ship, to see that the holds were in condition to receive cargo and the bilges and scuppers clean. There were 2-inch battens in the compartment, about one foot from the skin of the ship, and 2-inch dunnage was on the floor, which had been cleaned and scattered with sawdust in order to keep the space dry. The crates of onions were tiered up, leaving a free space about the depth of a crate between this cargo and the fore and aft bulkheads. It was shown, without any real contradiction, that the stowage was proper and the ventilation good, even when the hatches had to be closed, but also that the hatches were opened to air the cargo whenever practicable. We hold that there was no neglect in stowage, or in the care or custody of the cargo.

There was evidence that some of the rotting of the onions was caused by sweat arising from condensation as the vessel passed from warm into cold temperatures. This was covered by an exception in the bills of lading.

We agree with the court below that the navigation of the vessel after the fog commenced on the day of the stranding was not skillful. Completely to miss Ambrose Light, and to strand on the Long Island shore, as this vessel did, calls for the fullest explanation. The trial judge concluded that the vessel had been run in a dense fog from Barnegat to Jones Inlet, and had made this distance of 50 miles in less than five hours. This was at the average speed of more than 10 miles an hour, which was close to the maximum speed of the ship. The conclusion is based on complainant's own evidence as to the position of the Buckleigh. The log entries and the statement of claimant's officers were to the effect that the speed of the vessel was much slower than the findings of the trial court indicate.

■ To reconcile his own evidence, claimant argues that the Buckleigh was farther up the New Jersey coast than the observation that was taken at 8 a. m. on March 16th, before the fog set in, showed, and accordingly that her speed has been exaggerated. But, if the observation was inaccurate, it seems difficult to justify the error, and, if it was not inaccurate, then the vessel must have been proceeding at high speed in a fog. To be sure, there was testimony that soundings were taken every 15 minutes. But, even so, soundings taken when going at high speed were of little use. It is evident that the position of the vessel after the fog set in was not really known, for, during the morning of March 16th, a request was made to the radio station at Brooklyn for bearings, and none could be obtained, because the Buckleigh had no 800 meter wave length. Though she could not get her true bearings, she went on at full speed, practically relying only on dead reckoning to shape her course. In the circumstances, she should have proceeded more slowly by the aid of accurate soundings taken with a deliberation that was impossible when going at high speed, and if, as seems to have been the case, she did not know her position, she should have anchored until the fog abated and she could navigate safely. She did neither. In spite of the dangers and difficulties attending a dense fog, which sometimes serve to extenuate marine casualties, we are forced to conclude that her navigation was negligent.

■ While section 3 of the Harter Act (46 USCA § 192) exempts the owner of a vessel transporting merchandise to any port in the United States from damage resulting from faults or errors in navigation, or in the management of the vessel, where due diligence has been exercised to make the vessel seaworthy and properly manned, equipped, and supplied, there must be some proof of compliance with the statute, if it is desired to secure the benefit of the exemption. But it cannot be supposed that an owner does not come within the protection of section 3 of the Harter Act, if he has selected a master and crew from a class of men having adequate experience and proper licenses, unless a further inquiry would have disclosed defects in character, knowledge, or fitness which their past service did not naturally indicate.

Baldasarre had been master of the Buckleigh since October 12, 1922, when he assumed command of her. He had a certificate as overseas captain under the Italian flag, had been going to sea for 22 years and had been master in command of vessels 13 years. The chief engineer testified that Baldasarre was one of

the best captains in the merchant marine of Italy. His capacity was also emphasized by the first officer.

The first officer, Prospero, had been going to sea for 18 years, had a mate's certificate for 2 years, and a master's for 11. He had been on the Buckleigh since about the middle of October, 1922. He had been in the Italian Royal Navy for 5 years, where he had commanded a fleet of torpedo boat destroyers, and he had been on 6 different merchant ships.

Emanuel Boera, the second officer, had been going to sea for 5 years and held a master's certificate. He had been on the Buckleigh since October, 1922.

Farrari, the chief engineer, had held a chief engineer's license for about 26 years, and had been employed on from 18 to 20 steamers. He had been on the Buckleigh from October, 1922, and held the title of first captain in the Italian Navy. He said the Buckleigh was only 5 years old, and her engines and pumps were in very good condition.

It is to be observed that each of these officers was a man of long experience, who, moreover, had been 5 months with the claimant prior to the time of the stranding. It would seem unreasonable to require further evidence of fitness. If such men as these had anything against them, because of some prior display of bad character or incapacity, the libelant ought to have offered proof of this to meet the prima facie showing of training and capacity that such long service and unrevoked masters' certificates made. Enough evidence was offered to place upon the libelants the duty of going forward with proof, if they wished to avoid the exemptions of the Harter Act (46 USCA § 190 et seq.). This conclusion is in accord with our opinion in The Fri, 154 F. 333.

The Cygnet (C. C. A.) 126 F. 742, is relied on as showing the contrary. The negligence there was most flagrant, for there the captain of a tug having a barge in tow brought her in contact with the pier of a bridge because he did not look to see whether his tow was straightened until he was close to the bridge. The fault was so gross that the court regarded the master as presumptively incompetent, and the owner as bound to show more than that the master had navigated the tug Cygnet and another small boat on the Merrimac river for 2 or 3 years before. In the Fort Morgan (C. C. A.) 284 F. 1, nothing was proved as to capacity of the engineer's assistants, and nothing was shown about the chief engineer, except the testimony of an official of the owner that he was competent. Here the experience of all the ship's officers was proved, and it was long, extensive, and important. We hold that a prima facie case was thus made. No testimony was introduced by libelant to indicate that any amount of investigation would have shown that the selection of the officers was not justifiable.

The cause is remanded, with directions to dismiss the libel, with costs, and the decree, as so modified, is affirmed.