**In the Matter of TA CHI NAVIGATION (PANAMA) CORPORATION, S.A., As Owner of the SS Eurybates, In a Cause of Exoneration From Or Limitation of Liability.**

Civ. A. Nos. 75–2735, 76–2102, 76–2210, 77–1768, 77–2443 and 77–2246.

United States District Court, E. D. Louisiana.

March 30, 1981.

Robert B. Deane and Robert B. Fisher, Jr., Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for limitation plaintiff Ta Chi Navigation.

Allen van Emmerik, U. S. Dept. of Justice, Torts Branch, Washington, D. C., for claimant U.S.A.

## OPINION

DUPLANTIER, District Judge.

These consolidated cases arise out of a collision at sea on August 7, 1975, between the SS EURYBATES, a Panamanian registered freighter, owned by TA CHI Navigation (Panama) Corporation, S.A., and the USS DAHLGREN, a United States Navy destroyer. For the following reasons, in which we will refer to the two parties by the names of their respective vessels, the court finds that the collision was caused solely by the EURYBATES without fault on the part of the DAHLGREN and that the EURYBATES is liable in full for the recoverable damages, which are set forth below.

## LIABILITY

There is little dispute about the relevant facts which led to and resulted in the collision. The parties differ, of course, in their interpretation of those facts and their application of the facts to the relevant standards of care.

### The EURYBATES

In the early morning hours on the day of the collision, the EURYBATES, after transiting the Panama Canal, departed Cristobal, Canal Zone, and proceeded past the breakwater at the entrance of the harbor. After dropping off the harbor pilot, she set a course of 0°, or due north, heading for a sea buoy 2.8 miles north of the breakwater at the harbor entrance. The EURYBATES intended ultimately to pursue a northwest heading, her objective being Santo Domingo, Dominican Republic.

At about 0327 hours,[1] the master of the EURYBATES spotted a group of white lights about 45° off the ship's starboard bow and at a distance of about 6 or 7 miles. He watched the lights for about two minutes from the starboard wing of the bridge, then went back into the wheelhouse. The master and those crew members of the EURYBATES who saw them concluded that the white lights were fishing vessels; they took no action with respect to them. At this time, the master, the second mate, and the helmsman were the only persons on the bridge.

At 0330 hours, the master ordered the engines full ahead. Four minutes later at 0334 hours, he spotted the sea buoy straight ahead and ordered a course change to 12° (moving the vessel's course slightly eastward) in order to leave the buoy to port.

---

1. For convenience, when describing the course of the EURYBATES we use the times as reported in her log. For the DAHLGREN, we will use her log times. The DAHLGREN's clock was about 2 minutes ahead of the EURYBATES; thus the naval vessel's log showed 0345 hours as the time of the collision, while the EURYBATES' log showed 0343 hours. For a comparison of the two vessels' actions during the minutes before collision, see the chart in the text below.

The EURYBATES passed the buoy at 0337 hours. Within several minutes thereafter the master walked to the starboard wing where he saw a line of red lights "shooting towards" the EURYBATES at a relative angle of about 50 degrees. He estimated the nearest of these vessels to be 0.7 miles away.

The master ordered the helm 20° to port, then hard to port, and ten seconds later ordered stop engines. The time was about 0340, about three minutes before collision.

*The DAHLGREN*

The line of red lights were running lights of Task Force 130, a column of six United States and Colombian naval vessels, deployed in a single-file column about 5000 yards in total length. The lead vessel and the vessel in command of this column was the USS DAHLGREN.

The naval ships were heading in a generally southwest direction; they were planning to enter Cristobal harbor and then transit the Panama Canal.

At 0333 hours the column changed its course heading from 225° to 230°; the plan was to proceed towards the sea buoy mentioned above and then to head south to the entrance to Cristobal harbor.

The DAHLGREN was equipped with a number of sophisticated devices to locate, chart, and track other vessels or aircraft. One of these devices was the Naval Tactical Data System. Using input from the ship's radar, this system would determine the relative courses of the DAHLGREN and other vessels, and then compute an estimated "Closest Point of Approach" (CPA).

When the EURYBATES first appeared on the DAHLGREN's radar, the CPA was computed at 1200 yards to starboard. This meant that on its course as first tracked, the EURYBATES would pass in front of the DAHLGREN at a distance greater than 1200 yards, and that the vessels would be closest to each other after the crossing, when the EURYBATES was to the DAHLGREN's starboard side.

This first CPA was relayed to the bridge at about 0333 hours, just before the EURYBATES shifted course from 0°, due north, to 12°, slightly eastward.

Not long after this report was received, the officers on the bridge of the DAHLGREN sighted the lights of the EURYBATES ahead and to the left. It should be noted that with all of the sophisticated radar, electronic, and computer equipment on board the DAHLGREN, once a visual sighting of the vessel occurred, the most accurate means of tracking the EURYBATES and ascertaining its course was through the eyes of the men on lookout and on the bridge. The crew of the DAHLGREN continued to watch the lights of the EURYBATES; they observed that she showed a "left bearing drift" with respect to the DAHLGREN. That is, as observed from the DAHLGREN, after the EURYBATES had turned slightly to the right (eastward) she was following a course which would take her past the DAHLGREN, to that vessel's port side. This "left bearing drift" was determined by watching the mast and range lights on the EURYBATES. Based upon whether the relative angle of these lights seemed to be opening or closing, one could ascertain the relative heading of the vessel.

At about 0336 hours, a CPA of "close aboard to port" was reported. This meant that the EURYBATES was projected to pass within 500 yards of the DAHLGREN's port side. The report confirmed the left bearing drift which had been observed by the men aboard the DAHLGREN and reflected the EURYBATES' course change to 12°. The officers on the bridge of the DAHLGREN became concerned, at this point, that the EURYBATES might collide with one of the other vessels in their column.

At all times, the DAHLGREN was the "privileged vessel". As will be discussed more fully below, it was under an obligation to maintain its course and speed. The EURYBATES was under a concurrent obligation to slow, stop and turn right so as to

pass behind or to the port side of the privileged vessel. Thus, although the men aboard the DAHLGREN were aware that the situation was somewhat close, they decided to maintain course in the expectation that the EURYBATES would continue to turn to starboard so as to pass behind the naval column. The lookouts and officers aboard the DAHLGREN continued to monitor the EURYBATES' progress closely.

Suddenly, the lookouts noticed the EURYBATES turning to port. (This was the maneuver confirmed by the EURYBATES' master, which he made when he first noticed the red lights "shooting" toward him). Lieutenant DeJong, who was keeping watch on the port wing of the bridge, walked onto the bridge and exclaimed: "Do you see this guy coming in on the left?"

The port turn by the EURYBATES took the officers of the DAHLGREN by surprise and caused the collision. The DAHLGREN commander ordered right full rudder and all back full, but collision was imminent and inevitable.

The bow of the DAHLGREN struck the starboard side of the EURYBATES at an angle of about 50 degrees. (See Joint Stipulation, Plaintiff's Exhibit 20).

*Negligence*

■ The International Rules are applicable to this case.[2] When the vessels first came into each other's view, a crossing situation was presented. With the EURYBATES heading generally in a northerly direction, and the DAHLGREN heading southwest, the EURYBATES had the DAHLGREN to her starboard. Therefore, under Rule 19[3] the EURYBATES was the burdened vessel and had a duty to keep out of the DAHLGREN's way. Further, under Rule 22[4], the EURYBATES was obliged to "take positive early action" and to "avoid crossing ahead of" the DAHLGREN. See *Sawyer v. McDonald*, 165 F.2d 426 (5th Cir. 1948); *Maroceano Compania Naviera, S.A. v. S.S. Verdi*, 438 F.2d 854 (2nd Cir. 1971); *Matter of State of La. Dept. of Highways*, 455 F.Supp. 272 (E.D.La.1978).

■ The EURYBATES' negligence began with the failure to keep a proper lookout. Between the time when the master first observed a group of white lights and the time when he saw the line of red lights coming towards his vessel, a period of about 13 minutes, there was apparently no one on the EURYBATES watching those lights. This was a clear night, with visibility at 6 or 7 miles. There is simply no reason, except for the failure to watch, which explains why the master of the EURYBATES failed to recognize the crossing situation sooner.

When the master of the EURYBATES finally recognized the situation, his reaction was directly contrary to the rules. He turned to port instead of to starboard. This changed a potentially dangerous situation, calling for a further starboard turn by the EURYBATES, into one where collision was unavoidable due to a sharp port turn. Comparing the compass headings of the two vessels, (12° for the EURYBATES, and

---

**2.** At the time of this collision the international rules were found at 33 U.S.C. §§ 1051–1094. Since that time, the United States has adopted the Convention on the International Regulations for Preventing Collisions at Sea, and the applicable rules are now found at 33 U.S.C. following § 1602.

**3. Power-driven vessels crossing (Rule 19)**

When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other.

**4. Positive action to keep out of way; crossing ahead of vessel having right of way (Rule 22)**

Every vessel which is directed by sections 1061 to 1094 of this title to keep out of the way of another vessel shall, so far as possible, take positive early action to comply with this obligation, and shall, if the circumstances of the case admit, avoid crossing ahead of the other.
33 U.S.C. § 1084, now repealed, but substantively incorporated in Rule 16 following 33 U.S.C. § 1602.

230° for the DAHLGREN) it can be seen that a starboard course change of 38° by the EURYBATES would have put her on a reciprocal course to that of the naval column, permitting her to pass the column safely, port to port.

It is probable that if the EURYBATES had made a starboard turn at the time she made the fateful port turn, such a reciprocal course would have been achieved and the collision avoided. However, we need not go so far as to reach this conclusion, because had the master of the EURYBATES been watching the lights of the naval column, he could have turned to starboard much sooner and easily avoided the collision. It was this failure to react sooner to the crossing situation, and the last-minute incorrect maneuver which were the primary causes of the collision.

EURYBATES offers a number of arguments to explain her actions and to attempt to cast liability on DAHLGREN. EURYBATES explains the port turn by arguing that she could not have safely passed behind the DAHLGREN because of the other vessels in the column close behind. However, there is no doubt that had the EURYBATES reacted sooner she could have safely passed behind the entire column. It would have taken only about seven minutes to complete a course change to a heading reciprocal to the naval column, a course which would have taken the EURYBATES in a northwest direction which was generally her ultimate planned heading anyway. During the seven minutes, the EURYBATES would have been involved in turning away from the naval vessels.

The EURYBATES also argues that the single-file column of navy vessels, two and one-half miles long, presented an unusual and difficult obstacle to other shipping and that the flotilla should have approached the harbor in a different formation which would have allowed the EURYBATES to

pass behind the DAHLGREN. However, the naval officers testified that the column was the usual and accepted mode of proceeding. The EURYBATES has cited no authority to support its contrary contention. Furthermore, it is hard to imagine a formation which would have presented less of a problem to the EURYBATES. It would surely have been much more difficult for the EURYBATES to have dealt with six independent obstacles on different courses rather than one long straight one. The Navy certainly has a right to conduct exercises involving numberous ships. We conclude that the safest way for such a flotilla to approach the harbor was the manner in which this one did.

Next, EURYBATES relies upon the second sentence of Rule 21, which governs privileged vessels, and also upon Rule 27, the special circumstances rule.

Vessels having right of way; duty in aiding to avert collision (Rule 21)

Where by any of sections 1061 to 1094 of this title one of two vessels is to keep out of the way, the other shall keep her course and speed. When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision (see sections 1089 and 1091 of this title).[5]

### Special circumstances requiring departure from rules to avoid immediate danger (Rule 27)

In obeying and construing sections 1061 to 1094 of this title due regard shall be had to all dangers of navigation and collision, and to any special circumstances, including the limitations of the craft involved, which may render a departure from such sections necessary in order to avoid immediate danger.[6]

**5.** 33 U.S.C. § 1083, now repealed but substantively incorporated in Rule 17 following 33 U.S.C. § 1602.

**6.** 33 U.S.C. § 1089, now repealed.

EURYBATES argues that once the CPA of close aboard to port was reported, the DAHLGREN should have taken two actions to avoid collision: (1) Turn to starboard, and (2) order the rest of the vessels in the column to maneuver independently. This order was sent out, coincidentally, at the same time as the collision. Such actions, EURYBATES argues, would have allowed her to pass safely behind DAHLGREN or the entire column, and would have obviated the necessity, as she saw it, of turning to port.

■ Rule 21 required DAHLGREN to maintain course and speed until such time as a collision could not be avoided by the EURYBATES alone (an *in extremis* situation). However, up until the moment EURYBATES made her fateful turn to port, the eyes and instruments of DAHLGREN indicated that there would be no collision with the lead vessel. DAHLGREN would have been in violation of the rules, and would have presented EURYBATES with an unpredictable situation, if she had changed course any sooner than she did. Thus, EURYBATES' argument that DAHLGREN should have turned to starboard sooner is without merit.

EURYBATES' second argument, that the order to maneuver independently should have been sent sooner, requires slightly more analysis but is equally without merit.

First, there were standing, routine orders for the flotilla to maneuver independently in order to avoid shipping. Of course, this does not answer the argument totally. If such an order would have resulted in the collision being avoided, then such an order should have been given explicitly. However, we conclude that such an order would have made no difference. This was not an unusual or urgent order that would have caused the following vessels to change course immediately. If the order to maneuver independently had gone out earlier, it is likely that the other vessels would still have held their course. They, like the DAHLGREN, were privileged vessels under the rules and under a duty to maintain course and speed. Moreover, even if the other vessels had altered course to starboard, the only way this maneuver would have prevented collision would have been *if* the master of the EURYBATES noticed this turn and if he then decided he could pass safely by turning to starboard and if he had then done so. This chain of reasoning is too speculative. It is more likely that a group of independently maneuvering vessels would have been even more confusing to the master of the EURYBATES, especially considering that he mistook a naval flotilla for a group of fishing vessels.

EURYBATES makes two other allegations of negligence on the part of DAHLGREN.

She argues that the radar equipment on DAHLGREN was set for long range rather than short range reception. But throughout the relevant time period, the vessels were in visual contact, a better method of ascertaining another ship's course than any radar equipment. Indeed, radar could not have told DAHLGREN anything about EURYBATES that she did not already know by simply watching. If the DAHLGREN's officers had been on the bridge of the EURYBATES, they could not have followed and tracked her course more exactly. Their observations match perfectly with the testimony of the captain of the EURYBATES as to the orders he gave.

Finally, it is argued that DAHLGREN failed to show proper lights, and particularly that a work crew on the stern of the vessel exhibited improper and confusing lights. We find as a fact that DAHLGREN exhibited all of the proper lights, and that there was no confusion actually caused by any activities or lights on board the DAHLGREN.

The following analysis of the sequence of events, commencing with the time at which the EURYBATES first sighted the DAHLGREN, confirms our conclusion that the collision was due entirely to the fault of the EURYBATES.

| ELAPSED TIME | VESSEL | APPROXIMATE LOCATION & COURSE | OBLIGATION | ACTION/REACTION |
|---|---|---|---|---|
| 0 | EURYBATES | Exiting harbor breakwater/0 - due north | To observe and interpret flotilla's lights | Saw only white lights; erroneous interpretation as fishing vessel. |
| | DAHLGREN | 6 to 7 miles NE of sea buoy/225° - southwest | To look out for shipping in the area. | Radar & lookouts alert, no sighting yet. |
| 3 | EURYBATES | Same course - heading for sea buoy. | To observe flotilla. | Not looking in that direction. |
| | DAHLGREN | Heading has been changed to 230° - southwest | Observe shipping | Saw lights of EURYBATES-charted her progress-computed C.P.A. as 1200 yds. starboard if both vessels maintain course and speed |
| 7 | EURYBATES | Near sea buoy/changed course 12° -NNE | Observe flotilla; prepare to give way as burdened vessel. | Not looking - changed heading 12° to starboard/ |
| | DAHLGREN | Same heading - 3 to 4 miles from EURYBATES | Monitor EURYBATES-maintain course and speed as privileged vessel. | Continued watch - observed starboard change of EURYBATES resulting in left bearing drift of EURYBATES. |
| 14 | EURYBATES | ( ) (Vessels 0.7 miles apart) ( ) | Burdened vessel. Slow stop,turn right-pass behind column. | Saw red lights for first time-turned left 20°, then hard left, then reversed engines. |
| | DAHLGREN | ( ) | Privileged vessel. maintain course and speed until in extremis situation; then turn away from collision course - watch closely | Turned right - away from collision when EURYBSTES left turn noted, then reversed engines. |

## DAMAGES

At the conclusion of the trial of the issues related to damages, the court dictated oral reasons for judgment covering all of the items of damage claimed by the United States, with the exception of three items referred to hereafter.

The three items of damages which were taken under submission are as follows:

A. A claim in the amount of $2,758.00 for "in-house" expenses incurred in conducting a survey of the damages to the vessel, which survey was conducted in the Canal Zone.

■ This claim is made up of a number of items of wages paid and travel expenses reimbursed to government personnel (see government exhibit 8–D). EURYBATES contends that the expenses of only one owner's representative are recoverable as damages. We have found no cases, nor have counsel offered any, which would place such a limitation on the DAHLGREN's right to recovery. Considering the seriousness of the situation, the distance of the DAHLGREN from its home port, and the general uncertainty of the circumstances, we hold that it was reasonable for the government to utilize the personnel which it did and that the expenses totalling $2,758.00 are recoverable.

B. A claim in the amount of $411.30, the amount paid by the government to an independent surveyor for the survey of the damage to the EURYBATES.

■ EURYBATES has stipulated that the DAHLGREN is entitled to recover for expenses of the survey of the DAHLGREN but contests the recovery of the costs of the DAHLGREN's survey of the EURYBATES. While there are no controlling cases which govern this issue, the only cases on point have refused to allow recovery for this type item, finding it to be a cost of defense rather than damages. *Calzavaro v. Moran Towing & Transportation*, 1941 AMC 1299 (S.D.N.Y.1941), *Pudget Sound Tug & Barge Co. v. USA*, 1969 AMC 1962 (W.D. Wash.1969). We find this to be a valid distinction and therefore deny recovery for this item.

C. A claim in the amount of $603,-207.00, representing the sum paid by the government to the various cargo owners.

To understand the nature of this claim an explanation of the posture of the parties at various stages of the litigation is necessary. Cargo interests, who owned cargo being carried by the EURYBATES at the time of the collision which was damaged or destroyed, filed suits against the EURYBATES and the DAHLGREN. The DAHL-

GREN denied liability, contending it was not negligent. The EURYBATES also denied it had been negligent and further contended that even if it was negligent, it was not liable to cargo because of the COGSA exemption as to errors in navigation. 46 U.S.C. § 1303 et seq. Had the cargo claims proceeded to trial, the following alternative results were possible: If the EURYBATES was found negligent but entitled to the COGSA exemption and the DAHLGREN had been found negligent to any extent, the DAHLGREN would have owed the cargo interests their full provable damages and would have been entitled to recover over from the EURYBATES those cargo damages, less whatever percentage of the fault was attributed to the DAHLGREN. For example, if the DAHLGREN had been found 10% at fault, and the EURYBATES had been found not liable to cargo because of COGSA, the DAHLGREN would have been cast in judgment for 100% of the cargo damage and would have recovered over from the EURYBATES 90% of the cargo damages. *United States v. Atlantic Mutual Insurance Co.*, 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907, 72 S.Ct. 666 (1952); *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

Faced with what it considered to be a likelihood of a finding of some degree of negligence on its part, while continuing to assert that there was none, the DAHLGREN decided to settle with the cargo interests by paying them 100% of their claim.[7] The EURYBATES recognized the validity of the cargo claims but disagreed with the DAHLGREN's proposed payment of the full claim. The DAHLGREN now seeks to recover from the EURYBATES the amount which was paid to the cargo interests to settle the cargo claims. The EURYBATES contests the DAHLGREN's right to recover any portion of the amount paid to cargo interests, on the ground that the DAHLGREN, having been found not to be at fault to any extent whatsoever in the collision, would not have been liable to cargo, and

that the EURYBATES would not have been liable to cargo because of COGSA exemption. We conclude for reasons hereafter that the EURYBATES would have been liable to cargo and that it is liable to the DAHLGREN.

■ Technically, this is not an item of damages sustained by the DAHLGREN in the collision, as was the situation in *U. S. v. Atlantic Mutual Ins. Co.* In the final analysis, because the DAHLGREN was not at all at fault, it paid that which it did not owe. Conversely, for the reasons set forth hereafter, EURYBATES declined to pay that which it did owe, under the mistaken belief that it was exempt from cargo claims by COGSA. Because the DAHLGREN paid an obligation which was owned by the EURYBATES, DAHLGREN, as subrogee of the interests of the cargo owners, is entitled to recover from EURYBATES the amount which DAHLGREN paid to the cargo interests in settlement of their claims. Subrogation is available in admiralty where, as here, the subrogee is not acting as a volunteer. *Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co.*, 303 F.2d 692 (5th Cir. 1962), cert. denied 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed. 276 (1962). Faced with the possibility that it would be found to be at fault to some degree and therefore would be liable to cargo interests, the DAHLGREN cannot be considered to have acted officiously. *Continental Casualty Co. v. Canadian Universal Insurance Co.*, 605 F.2d 1340 (5th Cir. 1979); See *American Commercial Lines, Inc. v. Valley Line Co.*, 529 F.2d 921 (8th Cir. 1976).

The equitable nature of subrogation is well expressed in numerous cases:

"(Subrogation) ... is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." *Compania Anonima Venezolana De Navegacion*, quoting 50 Am.Jur. Subrogation § 7 at 686.

---

7. The amount paid to cargo apparently included nothing for pre-judgment interest, which, had the case been tried, would have totalled thirty to forty percent.

"Subrogation is an equitable doctrine rather than a contractual doctrine, applied in the interests of justice when one who is not a volunteer pays an obligation which should be imposed on another. *American Commercial Lines.*

"It is a creature of equity; is enforced solely for accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." *Continental Casualty Co.* quoting *Memphis and L.R.R. Co. v. Dow*, 120 U.S. 287, 301–302, 7 S.Ct. 482, 489, 30 L.Ed. 595, 601 (1887).

We apply here that fundamental equitable principle of subrogation; the DAHLGREN, acting not as a volunteer or intruder, paid the debt to cargo which it did not owe; it will be reimbursed by the EURYBATES which did owe the debt.

We now proceed to discuss the reasons why EURYBATES owed the debt to cargo, notwithstanding its contention that the COGSA "error in navigation" exemption would protect it from liability to cargo.

There is no doubt that the EURYBATES was grossly at fault in the collision; the issue is whether that fault falls within a COGSA exemption which would shield the EURYBATES nonetheless from liability for cargo damage. If the EURYBATES would have been liable to cargo, then the DAHLGREN having paid the cargo damage, would be entitled to reimbursement as subrogee.

An analysis of the COGSA exemption from liability should commence with a brief review of the history of these provisions.[8] COGSA's predecessor, the Harter Act of 1893, was developed in reaction to the practice of British shipowners of including fine print clauses in their bills of lading which relieved them of liability for cargo loss or damage from a variety of causes, including their own negligence. Shippers sought to have these exculpatory clauses banned from ocean bills of lading, while shipowners lobbied for statutory exemption from liability

for certain causes. The result of this debate was the Harter Act, which compromised by requiring the shipowner to use due diligence to make the vessel seaworthy but exempted him from liability for "damage or loss resulting from faults or errors in navigation, or in the management of said vessel . . ." 27 Stat. 445 (1893). This compromise failed to solve the conflict between cargo interests and shipowners.

In *The Isis* [*May v. Hamburg-Amerikanische Aktiengesellschaft*] 290 U.S. 333, 54 S.Ct. 162, 7 L.Ed. 533 (1933), the Supreme Court held that for the shipowner to be exonerated from errors in navigation and management he had to prove that due diligence was used "in all respects" to make the ship seaworthy. Proof of seaworthiness was held to be a condition precedent to protection by the Harter Act exemptions, regardless of whether or not there was a causal relationship between the unseaworthiness and the cargo loss or damage.

The weighty burden of proof which *The Isis* imposed on shipowners was a decisive factor in bringing about the enactment by Congress of COGSA in 1936. COGSA follows the Harter Act closely but requires that there be a causal relationship between unseaworthiness and cargo damage for liability to be imposed. In pertinent part, COGSA states:

46 U.S.C. § 1303(1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

(a) Make the ship seaworthy;

(b) Properly man, equip, and supply the ship;

§ 1304(1) Neither the carrier nor the ship shall be liable for loss or damage resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned . . . Whenever loss or damage has resulted from unseaworthiness, the burden of proving the

---

**8.** See: *The Absolute Warranty of Seaworthiness: A History and Comparative Study*, 24

exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

■ The resolution of claims arising under COGSA necessarily is governed by the assignment of burdens of proof. The carrier has the burden of proof in bringing itself within COGSA's 1304(2)(a) exemption by showing that the cargo loss or damage resulted from an error of navigation or management of the vessel. Should the shipowner sustain its burden, the burden then shifts to the cargo interest to establish unseaworthiness and that that unseaworthiness was the cause of the damage. If the cargo interest carries this burden, the shipowner could still be exempted from liability by proving that due diligence was exercised to make the ship seaworthy. *California and Hawaiian Sugar Co. v. Columbia Steamship Co.*, 391 F.Supp. 894 (E.D.La.1972); affirmed 510 F.2d 542 (5th Cir. 1975).

The EURYBATES contends that it has been proved that the cause of the collision with the DAHLGREN was an error in navigation or management of the vessel and that therefore the EURYBATES, as the carrier of the damaged cargo, is exempt from liability by § 1304(2)(a).

We have already concluded that the failure on the part of EURYBATES' Master to recognize and react sooner to the crossing situation, and the last minute incorrect maneuver were the primary causes of the collision. These failures of the master are, at the least, errors in navigation, and therefore qualify, at least initially, for exemption from liability for cargo damages under § 1304(2)(a). However, the qualification for exemption from liability due to errors in navigation does not end the inquiry into the potential liability of the EURYBATES. The burden then shifts to the cargo interests to prove that the EURYBATES was

unseaworthy and that such unseaworthiness was the cause of collision which damaged the cargo.

The focus of our analysis now turns to the interface between unseaworthiness and errors in navigation.

■ While COGSA clearly establishes that a showing of seaworthiness is not a condition precedent to a finding of nonliability under the COGSA exemptions, the two concepts are not necessarily mutually exclusive. It is well established that an inadequate crew constitutes unseaworthiness. An inadequate crew may be due to either insufficient manning of the vessel or to an incompetent crew. *Orient Mid-East Lines v. A Shipment of Rice*, 496 F.2d 1032 (5th Cir. 1974). If an incompetent crew causes a collision which results in damage to the cargo, the shipowner will be liable for the cargo damage if he cannot prove due diligence in manning the ship in a seaworthy manner. The actual conduct of such an incompetent crew which is the cause of the damage may involve the navigation or management of the vessel; nonetheless if incompetence results in a navigational error which causes the collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the cargo damage. The fact that the unseaworthiness can be labeled as an error in navigation does not magically protect the shipowner from liability. At some point along a spectrum of performance competency, an error in navigation is attributable to incompetence on the part of the crew. If, for example, a vessel owner were to intentionally man a vessel with a crew which knew nothing about navigation, the errors in navigation which that crew would make and the resulting damage would likely be caused by "want of due diligence on the part of the carrier to make the ship seaworthy and to secure that the ship is properly manned."

COGSA protects cargo interests damaged by an unseaworthy vessel from failure of the owner to use due diligence to insure the seaworthiness of the vessel. Such protection cannot be circumvented by characteriz-

ing the manifestation of that unseaworthiness as a navigational error which is exempt from liability. If cargo proves that unseaworthiness caused cargo damage, the vessel is not protected by the COGSA exemption unless the shipowner proves due diligence, regardless of whether that unseaworthiness is manifested by navigational error.

The issue which is now before us is whether the crew of the EURYBATES was incompetent, thereby making the vessel unseaworthy. While it is possible to estimate the competency of a vessel's crew by examining their experience and licenses, perhaps the dispositive measurement is their performance as crew members. While a single series of events indicating gross negligence or mismanagement of the vessel may not be conclusive criteria determining the competency of the crew, certain instances can be revealing with regard to this issue.

In *The Cygnet*, 126 F. 742 (1st Cir. 1903), the captain of a tug which was pushing a barge failed to straighten out his tow before passing under a bridge in a location where there was a narrow channel and a tricky current. Because "the care and precaution were not what they should have been under the circumstances", the barge struck one of the piers of the bridge, damaging the barge and the cargo it was carrying. 126 F. at 743.

The master of the Cygnet had sailed on the tug for two years, had been the captain of another small steamer, had acted as a pilot on the river where the accident occurred and was licensed as a pilot for the river which permitted him to act as a master of a tug of the tonnage of the Cygnet. Nonetheless, the failure of the master to determine whether the tow was straightened out on its course and to receive any information in that respect before passing under the bridge was held to constitute such gross fault that a presumption of incompetency on the part of the master was raised.

An omission so great as this raises so strong a presumption of fact that the master was not competent as practically

to throw the burden on the (shipowner) to establish the proposition that they used due diligence with reference to his selection . . .

*Id.* at 746. The court found no evidence in the record that the owners had made any particular inquiries as to the competency of the master, and the court therefore concluded that the owners failed to prove that they had exercised due diligence to make the *Cygnet* seaworthy.

The presumption raised in *The Cygnet* is a logical one which recognizes that the quality of a crew or crew member may, in the absence of other proof, be accurately judged by examples of his performance. Citing *The Cygnet* as authority, the 9th Circuit also held that errors in navigation may be so extreme as to raise a presumption of the crew's incompetence. In *McGill v. Michigan Steamship Co.*, 144 F. 788 (9th Cir. 1906), the court held that the acts of an engineer and his testimony regarding his knowledge of the property of the oil which he was working with and which caused the vessel to explode, "are such as to carry the conviction that he did not have the knowledge and experience necessary to render him competent to have charge of the work involved . . ." His actions raised a presumption of incompetency which the owner of the vessel failed to rebut by showing that due diligence had been exercised in manning the ship with competent personnel.

Other cases have cited *The Cygnet* as authority for the proposition that an error in navigation or management of the vessel may be so gross as to raise a presumption of incompetence, but have nonetheless held that the crew was not incompetent, either because the error was not of such an extreme nature or because evidence was presented to show the experience and competence of the crew sufficient to rebut the presumption of incompetence. *The Humarock*, 234 F. 716 (S.D.Ga.1916); *The Buckleigh*, 31 F.2d 241 (2d Cir. 1929).

█ The errors of the crew of the EURYBATES can be described only as extremely gross fault. To mistake the lights

of a naval fleet for those of fishing vessels, to fail to monitor those vessels for approximately thirteen minutes while proceeding on a course which would take the EURYBATES in close proximity to the vessels, and finally to order a hard port turn which placed the EURYBATES directly in the path of the naval vessels, contrary to the rules of navigation, is more than just error. This level of performance raises a presumption that the collision was not caused merely by an error in navigation by an otherwise competent crew; these actions must be presumed to be those of a crew which was incompetent. Clearly not all errors in navigation constitute incompetence, but errors of a sufficiently aggravated nature, such as the errors of the master and crew of the EURYBATES, transcend ordinary fault and constitute proof of incompetence, in the absence of contrary proof.

Faced with proof of unseaworthiness due to crew incompetency, the carrier has the burden to prove due diligence to man the ship in a seaworthy manner. The only evidence in the record concerning the competency of the crew, other than the actual conduct of the crew which caused the collision with the DAHLGREN, is in the depositions of the crew, which contain testimony regarding their training, licensing and experience. In the absence of further proof in the form of inquiries made by the shipowners, recommendations as to competency, or proof of a reputation for competence, the shipowner has failed to carry its burden of proving that it exercised due diligence to make the ship seaworthy by manning the vessel with a competent crew.

The only evidence offered to prove the competency of the master of the EURYBATES, who was the crew member primarily responsible for the series of mishaps which resulted in the collision, was as follows: (a) he had been a master for three years prior to the collision and had a master's license from Panama. (Deposition of Liu Chi Show p. 7) (b) his formal maritime education consisted of a one year course in navigation (Deposition of Liu Chi Show p. 5). (c) he had been the master of the EURYBATES for only five and a half

months before the collision. No proof was offered that the shipowner made any inquiry into his competency and reputation, or that the shipowner offered any training.

■ A review of cases which have found crew members to be competent in the face of navigational errors which might otherwise cast doubt on their competency supports the conclusion that this proof of the master's qualifications falls short of satisfying the burden which the shipowner has of proving that due diligence was exercised. *In Director General of India Supply Mission v. SS Janet Quinn*, 335 F.Supp. 1329 (S.D.N.Y.1971), the court found that the master had had his master's license for 20 years, had sailed those particular waters "for many years", and was familiar with the area and the proper procedure. There was also evidence that the master had good recommendations. In the face of such evidence, the court found the shipowner not liable.

In *In re Grace Line*, 517 F.2d 404 (2d Cir. 1975) a pilot with "many years of experience" and a reputation for competency, who was assigned to the vessel by the Chilean government, and who had traveled the particular route in question three times previously, was found to be competent. The court held that cargo interests had failed to prove that the master was basically incompetent and the ship unseaworthy.

The master of the EURYBATES did not have vast experience as did the masters of the vessels in the cases discussed above. The burden is on the carrier to prove that due diligence was exercised in hiring Liu Chi Show as the master of the EURYBATES. There is nothing in the record which sheds light on the procedure that was followed in hiring him as the master; no mention is made of recommendations, inquiries, reputation or special experience or training. His limited experience does not, by itself, prove either competency or due diligence on the part of the shipowner "to secure that the ship (was) properly manned." No proof has been offered of any owner diligence whatsoever.

Because the damage was caused by an unseaworthy condition resulting from an incompetent crew, and because the owner has failed to carry the burden of proving that due diligence was exercised in manning the ship, the owner of the EURYBATES would have been held liable for the cargo damage which resulted from the collision with the DAHLGREN had that issue proceeded to trial with the cargo owners. The United States of America, having paid the cargo damage, is subrogated to the claim of the cargo owners against the carrying ship, the EURYBATES.

■ With the inclusion of the cargo claims as recoverable items, the issue of the limitation of liability becomes relevant. Under 46 U.S.C. § 183, a shipowner may limit his liability for damage claims arising out of the voyage of his vessel to the value of his investment in the vessel and pending freight, if the damage was occasioned without the privity or knowledge of the owner. In ascertaining whether the shipowner is entitled to limitation, the court must first determine which acts of negligence or conditions of unseaworthiness caused the damage and then must determine whether the shipowner had knowledge or privity of these specific acts or conditions. *In re Brasea, Inc.*, 583 F.2d 736 (5th Cir. 1978).

■ As stated above, we hold that the vessel owner failed to exercise due diligence in manning the ship, which was under the control of an incompetent master and crew. It was the omission of the vessel owner which created the unseaworthy condition, caused the collision, and resulted in the imposition of liability upon the EURYBATES.

The question of whether or not the owners of the EURYBATES had privity or knowledge of this unseaworthy condition depends upon whether there was "complicity in the fault that caused the accident." *Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204 (5th Cir. 1968). The fault that caused the accident in this case was the incompetent crew, which the vessel owner, by his failure to exercise due diligence, participated in creating. See *Doughty v. Nebel Towing*, 270 F.Supp. 957 (E.D.La.1967). While the failure to exercise due diligence may not always be the same as privity or knowledge with regard to an unseaworthy condition, we find that in this case, they are the same. The vessel owner's own omission contributed to the unseaworthiness of the EURYBATES, which requires a finding of privity.

The burden is on the vessel owner to prove the absence of privity or knowledge of the conditions causing the damage. *Coryell v. Phipps*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). The owners of the EURYBATES have failed to carry this burden, and therefore limitation is denied.

## INTEREST

■ Pre-judgment interest is the rule in admiralty absent special circumstances. *The Complaint of the M/V Vulcan*, 553 F.2d 489 (5th Cir. 1977). There are no special circumstances in this case. Hence the United States of America is entitled to pre-judgment interest from the date of collision on all items of damage except the amount of the payment to cargo. As to that item, interest is due only from the date of payment by the United States of America to the cargo interests.